# Exhibit A

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - X

KELVIN FRAZIER and ARIEL ALVAREZ, on behalf of themselves and all others similarly situated, and KENNETH HOYTE, individually,

Docket No. 24 Civ. 7364 (JS)(AYS)

Plaintiffs,

-against-

LOOKS GREAT SERVICES, INC.,

Defendant.

- - - - - - - - - - - - - - - - - - X

October 15, 2026
10:07 a.m.

EXAMINATION BEFORE TRIAL of MARCUS PITTS, Appearing for Defendant, LOOKS GREAT SERVICES, INC., taken pursuant to Notice, held via teleconference before a Notary Public of the State of New York.

* * *

A P P E A R A N C E S:

KESSLER MATURA, P.C.,
Attorneys for Plaintiffs
445 Broadhollow Road
Suite 316
Melville, New York 11747

BY: GARRETT KASKE, ESQ.
AND: JOCELYN SMALL, ESQ.
E-mail: Gkaske@kesslermatura.com

MEISTER SEELIG & SCHUSTER PLLC,
Attorneys for Defendant
125 Park Avenue, 7th Floor
New York, New York 10017

BY: VALERIE FERRIER, ESQ.
AND: CHARLOTTE PRAMER, ESQ.
E-mail: Vkf@mss-pllc.com

* * *

IT IS HEREBY STIPULATED AND AGREED, by and between the attorneys for the respective parties hereto, that the sealing and filing of the within deposition be waived; that such deposition may be signed and sworn to before any officer authorized to administer an oath with the same force and effect as if signed and sworn to before a Justice of this Court.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to form, are reserved to the time of trial.

IT IS FURTHER STIPULATED AND AGREED that the within examination and any corrections thereto may be signed before any Notary Public with the same force and effect as if signed and sworn to before this Court.

Case 2:24-cv-07364-JS-AYS Document 43-1 Filed 10/28/26 Page 5 of 40 PageID #: 253


- Marcus Pitts -

M A R C U S P I T T S,

the witness herein, having been first duly sworn by Christy J. Rockower, a Notary Public of the State of New York, was examined and testified as follows:

oOo

THE REPORTER: Will the witness please present a government issued ID by holding it up to the camera for identification.

(Witness complies.)

EXAMINATION CONDUCTED BY MR. KASKE:

Q Would you please state your name.

A Marcus Pitts.

Q What is your address, please?

A 14 Bartlett Place, Huntington, New York 11743.

Q Good morning, Mr. Pitts. My name is Garrett Kaske, I'm an attorney with

- Marcus Pitts -

great, it's caught at the end of the week --

A Great.

Q And then payroll is then processed?

A Correct.

Q Are we missing any steps?

A Not off the top of my head. The employees do sign off on their sheets that their punch-ins are correct. Also, if they were injured or not injured on the job. I mean, I don't know if that's a step that's pertinent to this, but that's also a step.

Q Moving aside from -- let's put the injury thing to the side.

Signing off on their time, when and how do they do that?

A Daily.

Q Daily.

Do they have to do it at the end of the week too or just at the end of every day they do it?

A End of every day or clock in -- any clock-outs.

- Marcus Pitts -

Q Could you describe what would physically happen on their phone while they are doing that?

A Before -- if you click clock out it's going to prompt them and says, is this time entry correct or does there need to be any corrections made, essentially. I mean, I don't have the exact verbiage in front of me, but that's the general messaging, yes or no.

Q And then -- so they do that on a daily basis. And if they mess up in that process, right, you know, because they, as you mentioned earlier, maybe they put in the whole day as hourly when it should have been, you know, Christmas Decor or something. Then that -- Erik would then do the process we've already described; correct?

A Correct.

Q Do you know if the original punch and correction data was backed up as part of the backup process we discussed earlier?

- Marcus Pitts -

A Yes.

MR. KASKE: We'll call for the production of the track -- the time data associated with the changes.

MS. FERRIER: I'm pretty sure you already have that.

DOCUMENT/DATA REQUESTED_________________________

BY MR. KASKE:

Q So now your time with TSheets came to an end and you went to Foundation, you said?

A TSheets -- TSheets is a time tracking software, Foundation is an accounting CRM.

Q Am I correct that you went from QuickBooks to Foundation?

A Correct.

Q And when you went to QuickBooks to Foundation, Foundation and TSheets were not compatible?

A Correct.

Q So what program did you use in

- Marcus Pitts -

Defendant's Objections and Responses to Plaintiff's First Set of Interrogatories. It is six pages. I'm going to bring you to the end that says verification.

Have you seen this before?

A I signed it, I would say yes.

Q When you were signing it you understood that you were verifying the accuracy of the responses in this document?

A Yes.

Q So at that time -- let me draw your attention to number 3. It says that Defendant identifies -- the response was Defendant QuickBooks, formerly TSheets, from 2017 to 2022, QuickBooks Desktop and BusyBusy and Foundation from 2022 to present.

A Yes.

Q Does that help refresh your recollection --

A Yes.

Q -- or do you think that might be off?

A Not exact, but it's going to be

- Marcus Pitts -

darn close.

Q Darn close could also be off by a year, right, because it's -- so it could be in 2021 or 2023, is that you mean?

A I believe our transition to Foundation was around the beginning of 2023 so we probably tried the software before that. Now, that could have been December of 2022, could have been the beginning of 2023, I mean...

Q So if that's the case, then the time records that we were just looking at -- I'm going to bring that back up. Do you see them?

A Yes.

Q That starts in August of 2022. Is it possible that these records cover -- this chart covers both TSheets time and BusyBusy time?

A I would have to -- where did you print that? I would have to know where you printed that document from. Is that a BusyBusy print or is that a QuickBooks time print?

- Marcus Pitts -

Q I will represent to you this was produced by your attorneys, so I don't know how it was compiled or printed.

Am I correct you don't know how it was compiled and printed?

A No, I don't know how it was compiled and printed. Does it matter if it was QuickBooks time or BusyBusy for the sake of whatever you're asking?

Q Yes, to the extent my question was: Does this include -- do you know if this includes BusyBusy and Foundation time, that's all?

A Foundation is simply an accounting software.

Q Sorry, BusyBusy and TSheets.

A That would be one or -- that would be one or the other. Looking at an Excel from four and a half years ago, I don't remember the exact format of the Excel whether that was a QuickBooks Excel, sorry, QuickBooks time Excel or a BusyBusy Excel.

Q Drawing your attention to the

- Marcus Pitts -

bottom of the sheet, says, generated from Looks Great Services 07/07/2026. You had no involvement in generating this document; correct?

A I don't remember generating this document.

Q You wouldn't know why it says, 07/07/2026 at the bottom?

A I would know why, because it was produced on that date.

MR. KASKE: Sharing a document with the Bates number Defendant 000002 on it.

BY MR. KASKE:

Q Do you know what the document is that I'm showing you?

MS. FERRIER: You haven't shared the screen yet.

MR. KASKE: There we go. Let's do this again.

Q Defendant 000002, this one page I'm marking as Plaintiff's Exhibit 11.

MS. FERRIER: Two things. Can you make it a lot bigger, and

- Marcus Pitts -

is paid at Looks Great Services?

A That would have been myself.

Q In formulating these policies, what did you consider?

A Conversations with Matthew Meyers.

Q What else?

A New York State Department of Labor law.

Q How did you consider the New York Labor Law?

A I looked at how do you pay a straight time, overtime person. To which it says, New York State overtime to be paid at time and a half, if you Google it or look that up, plainly, basically.

Q When did you look this up?

A I have no idea.

Q Did you take any notes when you looked it up?

A No. No emails. No text messages. Sorry, take your time, Garrett.

Q That's okay. It feels silly, I understand, I would laugh too.

- Marcus Pitts -

So you looked it up, made the determination. Did you look up whether or not -- did you look up the concept of a regular rate?

A Not that I recall, no.

Q Do you recall looking up, determining, like, when different earnings can -- need to be worked into an overtime rate?

A No, I did not look into that.

Q So from 2018 to 2024, did the overtime rate policy at Looks Great remain the same?

A Yes.

Q Did it apply to all the hourly paid overtime eligible employees?

A Yes.

Q Primarily -- I'm going to show you another document.

MR. KASKE: Can we go off the record for a minute?

(Off-the-record discussion)

MR. KASKE: I'm showing you a pay stub of Kenneth Hoyte,

- Marcus Pitts -

9/30/2022. It is -- bears the Bates stamp Defendant 2632. This will be Plaintiff's 14.

(Whereupon, Plaintiff's Exhibit 14, document Bates stamped Defendant 2632, was deemed marked for identification.)

BY MR. KASKE:

Q I'm going to increase the size. Can you see that all right?

A Yes.

Q What is this document?

A It's a pay stub, advice of deposit.

Q This covers the pay period of 9/19/2022 to 9/25/2022; correct?

A Correct.

Q So that means this would cover work that Mr. Hoyte performed between 9/19 and 9/25?

A Yes.

Q So here we see that Mr. Hoyte was paid 2.8 hours of overtime?

A Yes.

- Marcus Pitts -

Q What are the guardrails?

A Erik, and the -- what is now AI clocking, like checking generalities and helping spot inconsistencies such as knowing that a guy can't clock out of prevailing wage because he has to somehow get back to the yard unless he is teleporting home.

Q From 2018 to 2024, what were the guardrails, besides Erik?

A That's it. You got to just look at these and see where the guys are trying to potentially get one over periodically here any there or making honest mistakes. But it's hard to make an honest mistake when they have to actually click the thing that says, is this time sheet correct and accurate.

Q Going back to that week that we were looking at earlier, regardless of whether or not a lunchtime was missed --

A It wasn't missed.

Q Well, it's not in here is the point.

- Marcus Pitts -

A It's not in there. It could have been the -- the only way for it to be not be in there is the employee would have had to manipulate it out of there.

Q Erik also had the ability to manipulate it out of there?

A Yes.

Q So this -- but this week -- and the payroll is run off of this data; correct?

A I would have to see if this is pre-corrections or post-corrections.

Q How would you know if it's pre-corrections or post-corrections?

A Post-corrections, it's in the Excel -- it's going to be -- look like it's in an Excel document that comes.

Q Do you export, like, to Excel as part of the payroll process?

A No, that would have gotten exported directly to QuickBooks or directly to Foundation, and it comes out in the printout that you get that, I'm sure that we provided to you, it says, the payroll

- Marcus Pitts -

records and pay stubs. The export is the post-corrections.

Q Somewhere along the line you had the ability to export a pre-correction report?

A We don't export it until the corrections are done.

Q Are you aware if whether or not the software allowed you to export a report to show you, like, the before and after of the corrections?

A Not that I know of, no.

MR. KASKE: I'm going to show you now one of these -- this one is -- I'm going to show you a document that bears the Bates number DEF 000595, it's 97 pages, and it runs to DEF 000691.

Q Do you know what this is?

A Looks like a data pay wages from either a BusyBusy or QuickBooks time.

Q 2019, that would have been --

A TSheets.

Q -- TSheets.

- Marcus Pitts -

And then I'm just going to scroll real quick to the end. 2023, that would have been BusyBusy; right?

A Yes.

Q So let's -- I want to take a look at some time entries from December of 2019. At the end of the week, in this week Friday, Friday would be the end of the work week if there's no Saturday work?

A Correct.

MR. KASKE: So we're going to mark this document as Plaintiff's 15.

(Whereupon, Plaintiff's Exhibit 15, document Bates stamped DEF 000595 through 000691, was marked for identification.)

MR. KASKE: I'm going to show you Plaintiff's 16. So this is a pay stub also, the name Ariel Alvarez is on there, and that is Defendant 000588.

(Whereupon, Plaintiff's Exhibit 16, document Bates stamped

- Marcus Pitts -

Defendant 000588, was deemed marked for identification.)

BY MR. KASKE:

Q What is this document that I'm showing you?

A Advice of deposit from pay period from 12/02/2019 to 12/08/2019.

Q That's for Ariel Alvarez; correct?

A Correct.

Q So I'll scroll down here. Here it shows 10.85 hours of overtime at time and a half the hourly?

A Correct.

Q And that's -- so there's also on here 20 hours, 20.3 hours -- 20.31 hours of prevailing wage; correct?

A Correct.

Q And the week ending of that week was 12/8. So if we go for 12/8 that would be the Friday of 12/6?

A Correct.

Q On 12/6 it's showing Ariel Alvarez doing hourly from 7:03 to 9:10,

- Marcus Pitts -

then a punch from 9:10 to 12:30 at prevailing wage Nassau GM. The 12:30 to 1:00 lunch break. And then the 1:00 to 4:00 prevailing wage, and then it closes out with 1 -- 1 hour and 31 minutes of hourly work; is that correct?

A That is correct.

Q So it's fair to say that on his last day of work he was doing prevailing wage work; correct?

A Yes.

Q But all of the overtime worked was paid at his hourly rate, 1.5 times his hourly rate; correct?

A Correct.

Q Because that's just how payroll was processed from 2018 to 2024?

A Yes.

Q Do employees -- earlier you mentioned that sometimes the notes help you know who's got which machine; right?

A Yes.

Q How else did Looks Great Services track who had what machine from

- Marcus Pitts -

2018 to 2024?

A The schedules.

Q Schedules.

Were they tracked any other way?

A Not that I know of.

Q At one point did Looks Great Services use documents called daily logs?

A Yes, but I do believe that was before any time frame relevant to this case.

Q Okay. So Looks Great stopped using daily logs before March of 2018?

A I believe so. I believe we -- we tried to be -- come in the 21st century as much as possible with the start of TSheets.

MR. KASKE: Let me mark this next one as P 17. This is Bates stamped -- it's a long one, sorry, Looks Great_Frazier 00025012. I'm going to zoom in there.

(Whereupon, Plaintiff's Exhibit 17, document Bates stamped Looks

- Marcus Pitts -

A I don't know.

Q This was 2021, and you had already hired the person to do accounts payable at that time, right, accounts receivable?

A Yes.

Q Would that be hers, maybe yours, someone else's?

A Could be. I mean, could be mine, could be hers.

Q Do you recall ever seeing this page with the little highlights and markings?

A I don't recall seeing it. I mean, it's there. I can't recall every page that's ever been sent.

Q This is billing for five hours, right, for all those emergency services?

A Correct.

Q Just kind of like what we discussed earlier, some of this might -- some of these on this sheet might be related to those emergency services, in particular seeing that there's fives here.

- Marcus Pitts -

Some this work might have been performed for other jobs, right, during that week that are not covered by the invoice; am I correct?

A Yes. There's three employees there.

Q Right. What do you mean by that?

A Luis, Marvin, and Marlin.

MR. KASKE: I am nearing the end here. Can we take a ten-minute break and then I will do my best to get you out within 30 minutes. You're -- you might have questions, though, too. So...

MS. FERRIER: Yep.

MR. KASKE: Hopefully we can get this all done by 5:00. Just give me ten.

(Recess held from 3:57 to 4:11 p.m.)

BY MR. KASKE:

Q Going back to when the crew members would get paid for operating engineer rates. Am I correct that the

- Marcus Pitts -

company's policy was to pay for one hour per shift on those?

A Yes.

Q Can you explain that policy?

A So in conversations with Matthew Meyers, the minimum that you can pay somebody in any particular cost or class code is .5 or half an hour. And you have to pay the employee basically for when they are using that, being that it doesn't take an hour to pick up a tree or an hour to grind an stump, but they are doing it. I mean, it varies based on the tree, but it'd take five minutes to pick up a stump or pick up a tree or five minutes to grind a stump, and then they stop and then they go. In order to simplify things, I try to find what the mean average round up of an hour basically to accurately reflect what they're doing throughout the day.

Q When did this policy come into effect?

A It was pretty much -- it was right after I started working for the Town

- Marcus Pitts -

of Oyster Bay.

Q You referenced come up with the average, how did you do that?

A Conversations with Matthew Meyers, and I also have personal experience doing tree work.

Q You didn't do any, like, field testing?

A I didn't have to, I have the data in my possession.

Q What data do you have in your possession?

A We've been doing storm work for -- storm work for over a decade and been cutting trees down for over a decade. So I mean...

Q When you say "data," did you look at actual, like, numbers of a decades' worth of Looks Great Services times spent grinding stumps to find --

A Generalization. If you look at just across the industry, if you look at dump tickets for people that load log loaders and pick up debris, in a 12-hour

- Marcus Pitts -

dictate this aren't going to pay me for it as a skid steer, how can it be billed out or required for prevailing wage as a skid steer?

Q Just so I understand, you're saying that that machine, the Ditch Witch, wouldn't qualify for billing as a skid steer according to --

A In the county that --

Q -- the contract you have?

A Yeah. Correct. So if it's not going to be -- it's not going to count for the billing, how can you consider the operation of it -- different sizes of shovels.

Q Mechanical shovel, not like actual hand shovels?

A Correct, yes.

Q Where is that memorialized?

A Where is what memorialized?

Q Those size requirements.

A I mean, one that you can go to and you can look at is the Town of Huntington, is wheel loader in excess of

- Marcus Pitts -

15,000 pounds. That would fall under that category. A Ditch Witch weighs -- Bobcat MT55 weighs like less than 1,000 pounds, so it falls far short of a piece of heavy equipment, per their schedule.

Q So moving on from that piece of equipment, if -- you took this knowledge and created that one-hour policy; right?

A Correct.

Q And then -- how, if at all, did Looks Great confirm that individuals weren't operating the stump grinders, for example, longer than an hour or less than half an hour throughout the day?

A If they worked for less than -- it's -- it's kind of a good faith mean average, what it is. Somebody can go out and grind one stump, and that could take them five minutes, they'll get paid the entire hour. They could go out and grind six stumps that day and they get paid an hour on that -- for that.

Q If someone's grinding -- how long does it take to grind a stump, on

- Marcus Pitts -

average?

A Can vary.

Q What's the quickest it can take?

A Take two to five minutes.

Q On like a 18-inch stump?

A 18-inch stump, 10 minutes. But, again, there's a lot of speculation here. What species is the stump, is the ground wet, is it dry, does it have a fence post around it, is it completely rotten, is it not rotten. You know what I mean?

Q Right. Ideal conditions?

A Ideally, you can grind a stump in 10 minutes probably.

Q How large are some of the stumps that you all grind?

A What do you mean by large?

Q What I mean is, some of your billing revolves around the size of the stump; correct?

A Yes.

Q We looked at some pictures earlier and you said, like, that got booked as 18-inch when really --

- Marcus Pitts -

A Yeah.

Q I guess, what are the size, I guess, thresholds for your work?

A We do road size trees for the bulk of our work (audio distortion) and curb trees. There's 24 inches between the curb and sidewalk, so the vast far majority of the trees we do are under 20 inches because they have to fit within that curb. And they start uprooting that sidewalk far before they get to 36 inches. Not to say that 36-inch trees don't exist, they are just not the norm for the type of work that we do. Means --

Q Are the -- sorry.

A -- 14 to 18-inch trees all day long.

Q When grinding -- withdrawn.

Are there days in which individuals will grind more than one stump?

A Yes.

Q Are there days in which someone will be operating a stump grinder and going from spot to spot grinding multiple stumps?

- Marcus Pitts -

A And also doing all the other ground man duties that is tree work.

Q How many stumps -- are there days where someone might grind six stumps?

A Yes.

Q Are there days where someone might grind more than six stumps?

A It could happen.

MR. KASKE: Just want to -- one more. I'm going to show you -- this one is DEF 692 and it runs through DEF 754.

(Whereupon, Plaintiff's Exhibit 26, document Bates stamped DEF 692 to 754, was marked for identification.)

BY MR. KASKE:

Q Do you know what this is now that it's zoomed in?

A Kelvin Frazier, is this the same one you brought up earlier or no, this is a new of the same thing?

Q This is the time report for Kelvin Frazier?

A Yes.

- Marcus Pitts -

Q It cuts off in May of 2023. Do you recall that Kelvin was employed with the company until December of 2023?

A I don't recall the dates exactly, I'm sorry.

Q Any reason why his time for the rest of his employment would not be here?

MS. FERRIER: Objection. Assumes facts not in evidence.

You can answer.

A I don't know why.

Q I'm going to jump to March of -- yes, to February, then I'll do March. Here's a day in March of 2023, see it says there, March 3, 2023, on the top line, and --

A Yep.

Q -- there are one, two, three, four, five March 23 rows?

A March, you're looking at 3/3?

Q Yes.

A Yep.

Q In between the second and third row there's another row that says, notes.

- Marcus Pitts -

Do you see that?

A Yes.

Q It says, operator A grapple?

A Correct.

Q And then in between the fourth and fifth row of the 3/3 entries it says the same thing again?

A I do see that.

Q What do you take this to mean here, that there's two rows of notes for operator A grapple?

A I'm going to disertain (ph) this. Cannot take it as facts. But looking at this, it does look like -- and because now seeing this for a second time, it looks like that note, when the system takes the lunch break into there, it puts whatever first note that the person did when they first clocked in. And because it switches their cost code from prevailing wage ground man to the lunch break, it reinserts that note back in the end of the prevailing wage ground man when they actually clock out of that. That's what I

- Marcus Pitts -

take of seeing those two separate notes there. I think it's probably the way the software works.

Q Got it.

A Scroll down we can probably see if that would be a good theory. Again, I'm not in the system.

Q Neither am I. I will represent to you that just eyeballing these things there's lots of doubles. That's why I asked the question.

A I would say that that's probably a software function.

Q Is there any way to know from, outside of these records, whether or not Mr. Frazier was operating the grapple in the morning and when he resumed his prevailing wage post-lunch break? Not just limiting it to what you see in front of you, I'm saying are there documents or information that you could look at, right, to say, no, he was done with the grapple after, you know, 9:50 a.m., or whatever time that may be, and he had put it away

- Marcus Pitts -
and put it to bed by the afternoon?
A No, I don't.
Q Is it possible that he used the grapple in the morning and in the afternoon on this day?
A Yeah, he could have picked up a stick in the morning and then finished picking up a tree in the afternoon.
Q Is it possible that the collective time operating the grapple in the morning and the afternoon could have been more than an hour?
A It's possible.
MR. KASKE: I have no further questions at this time.
MS. FERRIER: I just have a few.
EXAMINATION CONDUCTED BY MS. FERRIER:
Q So, Marcus, you were asked some questions and you spoke a lot about Matthew Meyers.
A Correct.
Q You also mentioned your good faith and also that you had reviewed the

- Marcus Pitts -

Answer in this lawsuit; is that correct?

A What do you mean by Answer?

Q The document that Garrett showed you that was labeled the Answer to the Complaint, the formal pleading.

A Yes.

Q Are you familiar with the fact that Looks Great has asserted something called the Good Faith Defense by which the company is stating in sum and substance that whatever actions it was taking, it was taking in good faith?

A You refreshed and informed me right now. I do recall that with Bond Schoeneck.

Q If you can explain, what is the basis for your -- on behalf of the company, for the company's assertion of good faith in respect to this action in how it paid its employees?

A As soon as I had the first inkling of any legal matters around payments and prevailing wage, I never once ran from it or tried to hide it, I reached

- Marcus Pitts -

Q Does someone have to stand by it and maintain that or can you just set it and walk away?

A You can do both.

Q How is that?

A You can set it to feed, and you can just throw stuff in it and it will chip. If the ground men aren't cutting the crotches out of the pieces, and not -- or sometimes you have tricky wood, and you throw it in there and the wood gets stuck. You have to go over to the handle, hit the handle, and it spits it out. And then you're back to ground man duties where you're chopping the stuff up smaller, hit the handle, and it will start chipping again.

Q So the wood chipper -- can someone by themselves be chipping?

A What do you mean?

Q I mean turning it on, getting it going, you know, prepping the wood, feeding it in?

A Yeah, a person can do it by

- Marcus Pitts -

themselves.

Q You mentioned the five-man crew, do you run a five-man crew for every tree?

A No. Could be less, could be six guys.

Q Sometimes crews get broken up in a way where you have people taking down trees and then grinders and folks, other individuals, you know, grinding down stumps and then cleaning up?

A They are pretty much mostly in conjunction with each other. Like, the bucket guy can end up breaking off and starting the set-up at the next one while the last guy is there finishing blowing and raking, finishing cleaning up.

Q Does Looks Great Services have any way of knowing how long the machines are operating throughout the course of the day, like how long they are on?

A No. I mean, throughout a day, no. Unless somebody is going to go and look at the clock at the end of every single day.

- Marcus Pitts -

Q What do you mean, you mean -- what do you mean by the clock?
A Like an odometer on a car.
Q Machines have odometers?
A Hour meters.
Q Hour meters.
A But that signifies that the key is in the on position, it doesn't necessarily mean that it's running.
Q Stump grinders have odometers?
A No. Hour meters.
Q Hour meters?
A And that signifies that the key is in the on position, doesn't mean that it's operational or anything else like that.
Q It has it; correct?
A Correct.
Q Is that logged anywhere?
A No.
Q Is there any other way that you know how long one of these machines is on and operating throughout the day?
A No.

- Marcus Pitts -

MR. KASKE: That's all.

MS. FERRIER: I have a couple of follow-ups.

EXAMINATION CONTINUED BY MS. FERRIER:

Q So you were just asked a couple of questions about your efficiency and whether other people were less efficient at stump grinding than you. In your experience, if somebody was like the world's least efficient stump grinder, they are really terrible at it, would they in any circumstance spend a solid eight hours grinding stumps?

A No.

Q And you were just asked some questions about what somebody needs to do to prepare to grind stumps and after they are done using the stump grinder for any other piece of equipment. If -- and you mentioned, you know, for example, they would grease the machine, they would --

A Blow it off.

Q -- do maintenance on it. Are those tasks considered prevailing wage